CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

December 29, 2025

Laura A. Austin, Clerk

BY: /s/ K. Lokey

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

AMY H.,                              )
            Plaintiff,               )        Civil Action No. 3:24-cv-00071
                                     )
v.                                   )        REPORT & RECOMMENDATION
                                     )
FRANK BISIGNANO,                     )        By:    Joel C. Hoppe
Commissioner of Social Security,     )               United States Magistrate Judge
            Defendant.               )

Plaintiff Amy H. asks this Court to review the Commissioner of Social Security's final

decision denying her claims for disability insurance benefits ("DIB") and supplemental security

income ("SSI") under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 404–434,

1381–1383f. ECF No. 1. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B).

Having considered the administrative record ("R."), ECF No. 12, the parties' briefs, ECF Nos.

14, 18, 19, and the applicable law, I find that the Commissioner's final decision is not supported

by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge

reverse the decision and remand Amy's case under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

1

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). *See Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). Substantial-evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, a court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. The Legal Framework

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine if a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1]

The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. "At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (quoting 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2), 416.1429); *accord* 20 C.F.R. §§ 404.1520, 404.1560, 404.929. "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations" and vocational factors. *Mascio*, 780 F.3d at 635; *see Britt v. Saul*, 860 F. App'x 256, 263 (4th Cir. 2021) (citing *Mascio*, 780 F.3d at 636–37); *Jolly v. Barnhart*, 465 F. Supp. 2d 498, 504–05 (D.S.C. 2006). "If the Commissioner meets [this] burden, the ALJ finds the claimant not disabled and denies the application for benefits." *Mascio*, 780 F.3d at 635.

## III. Background

Amy filed for DIB and SSI in August 2020. *See* R. 262–63, 269–75. She alleged that she had been disabled since February 21, 2020, because of mouth cancer, major depression, anxiety and panic attacks, a "[r]eoccurring breathing disease," and high blood pressure. R. 83–84, 321. Amy was 51 years old, or a person "closely approaching advanced age" under the regulations, on her alleged onset date. R. 83; *see* 20 C.F.R. §§ 404.1563(d), 416.963(d). Virginia Disability Determination Services ("DDS") denied her claims initially in April 2021, R. 105–07, and upon

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the written decision subject to judicial review under 42 U.S.C. § 405(g).

reconsideration in June 2022, R. 133–34. In December 2023, Amy appeared with counsel and

testified at a hearing before ALJ H. Munday. R. 43–60. A vocational expert ("VE") also testified.

*See* R. 49–52, 60–64.

ALJ Munday issued an unfavorable decision on January 4, 2024. R. 17–35. As relevant

here, she found that Amy had four "severe" medically determinable mental impairments: major

depressive disorder, anxiety, personality disorder with cluster B traits, and Ekbom's delusional

parasitosis.[2] R. 20; *see* R. 31–32 (citing R. 113–14, 125–26). Those impairments did not meet or

equal a Listing, however, because they did not "result in one extreme limitation or two marked

limitations" in the broad areas of mental functioning. *See* R. 22 (citing 20 C.F.R. pt. 404, subpt.

P, app. 1 §§ 12.03(B), 12.04(B), 12.06(B), 12.08(B)). Instead, ALJ Munday found that Amy had

"no limitation" understanding, remembering, or applying information; a "mild limitation"

adapting or managing herself; a "moderate limitation" interacting with others; and a "moderate

limitation" concentrating, persisting, or maintaining pace. R. 22–23 (citing R. 53–56, 58–59,

331–38); *see also* R. 31–32 (citing R. 114, 126).

ALJ Munday then evaluated Amy's residual functional capacity ("RFC") based on the

medical and other evidence in her record. *See* R. 23–34. As relevant here, she found that Amy

could sustain full-time work involving "simple, routine tasks[] and occasional interaction with

the public."[3] R. 23; *see* R. 30, 33–34. ALJ Munday concluded that this RFC "is supported by

---

[2] Amy's prevailing objection challenges the ALJ's mental RFC determination that she could sustain full-
time work involving only "simple, routine tasks[] and occasional interaction with the public," R. 23. *See
generally* Pl.'s Br. 12–26, ECF No. 14. Accordingly, there is no reason to discuss the ALJ's findings
about her physical impairments or limitations.

[3] "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work
setting on a regular continuing basis"—i.e., for "8 hours a day, 5 days a week, or an equivalent schedule."
SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). Thus, ALJ Munday's mental RFC
assessment "implicitly contained a finding that [Amy mentally] is able to work an eight hour day," *Hines*,

[Amy's] admitted daily activities," the DDS reviewing psychologist's medical opinion that she can perform simple routine tasks with occasional public interaction, Amy's "mixed mental signs on exams with need for multiple medications and one brief psychiatric hospitalization, and the overall objective medical evidence of record." R. 34; *see* R. 25, 30–32. It does not restrict Amy's capacity to stay on task during an eight-hour workday and/or to complete a five-day workweek because the ALJ rejected specific medical and non-medical evidence supporting such limitations. *See* R. 24–25 (Amy's statements), R. 33–34 (Dr. Brickhill-Atkinson's medical opinion).

At step four, ALJ Munday found that Amy had past relevant work as a dog groomer, medium exertion, semi-skilled (DOT 418.674-010); a housekeeper, light exertion, unskilled (DOT 323.687-014); a kitchen porter, light to medium exertion, unskilled (DOT 318.687-010); and a cafeteria attendant, light exertion, unskilled (DOT 311.677-010). *See* R. 34 (citing R. 47–52). Relying on the VE's testimony, she found that Amy's RFC allowed her to meet the demands of housekeeper and cafeteria attendant as those unskilled jobs are generally performed in the national economy or as Amy actually performed them. R. 34–35. Accordingly, she concluded that Amy was not disabled at any time from February 21, 2020, through January 4, 2024.[4] R. 35. The Appeals Council declined to review the ALJ's decision, R. 1–3, and this appeal followed.

## IV. Discussion

Amy makes two distinct arguments on appeal. *See* Pl.'s Br. 8–11 (step four findings), 12–26 (mental RFC determination). First, she argues that the ALJ's finding that Amy "can perform her past jobs, the sole basis for denying her claim[s], is contrary to law" because the cafeteria

---

453 F.3d at 563, so long as her work involves only "simple, routine tasks" and "occasional interaction with the public," R. 23.

[4] ALJ Munday did not make any findings about Amy's vocational factors or evaluate whether, assuming Amy could not return to her past relevant work, she nonetheless could adjust to other work existing in the national economy. R. 34–35; *see* 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

attendant job did not count as substantial gainful activity and the VE's "own testimony demonstrates" that Amy's physical RFC did not allow her to return to the housekeeping job as actually or generally performed. *Id.* at 8. Second, Amy argues that substantial evidence does not support the ALJ's mental RFC determination, R. 23, because she improperly rejected consistent evidence showing that Amy's "persistent complaints of self-isolation," panic attacks, paranoia, and "delusions of bugs under her skin," R. 30, were so continuous and/or so severe that Amy would miss at least two days of work each month and would be off task for at least 20% of an eight-hour workday, R. 24 (citing R. 53–59, 331–38), 33 (citing R. 1074–75). *See generally* Pl.'s Br. 22–23 (Dr. Brickhill-Atkinson's medical opinion), 24–26 (Amy's symptoms and activities). The VE testified that "there would be no work" if Amy's mental RFC included either of those limitations. R. 63–64; *see* Pl.'s Br. 7. Amy's second argument is persuasive.

A.    *The Legal Framework*

RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted). It is a wholistic factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), including clinical findings, medical opinions, and the claimant's statements both to the agency and to her own healthcare providers, 20 C.F.R. §§ 404.1545, 416.945. The ALJ's actual RFC finding, 20 C.F.R. §§ 404.1520(e), 416.920(e), must "include those [functional] limitations that the ALJ considers credibly established," *Bryant v. Colvin*, No. 3:13cv349, 2014 WL 896983, at *1, *12 (E.D. Va. Mar. 6, 2014). The ALJ has broad (but not unlimited) discretion to determine if an alleged functional limitation is supported by or consistent with other relevant evidence in the claimant's

record. *See Hines*, 454 F.3d at 464–66; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at

*5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

The ALJ's written decision need only include a "narrative discussion describing" how specific

medical facts and non-medical evidence "support[] each conclusion" in the RFC determination,

SSR 96-8p, 1996 WL 374184, at *7, and logically explaining why the ALJ discredited evidence

that was inconsistent with or contradicted the conclusion, *Thomas v. Berryhill*, 916 F.3d 307, 311

(4th Cir. 2019). *See also Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 106 (4th Cir. 2020).

A reviewing court will affirm the ALJ's RFC determination when she "applied the correct legal

standards" and her decision "built an accurate and logical bridge from the evidence to her

conclusion." *Shinaberry v. Saul*, 952 F.3d 113, 120, 123 (4th Cir. 2020) (cleaned up).

Amy's challenge to ALJ Munday's RFC determination focuses on her conclusion that a

July 2023 medical opinion from Micah Brickhill-Atkinson, M.D., was "not persuasive" evidence

of Amy's alleged mental inability to sustain full-time work, R. 33–34 (citing R. 1072–75). *See*

Pl.'s Br. 20–24; Pl.'s Reply 4–6. She argues that the ALJ misapplied the governing regulation,

20 C.F.R. § 404.1520c, and did not provide "a sufficient explanation" for rejecting Dr. Brickhill-

Atkinson's proposed off-task and attendance limitations, Pl.'s Br. 14. *See also id.* at 20–23. Amy

also objects to ALJ Munday's conclusion that Amy's statements alleging disabling psychiatric

symptoms and mental limitations, R. 24 (citing R. 53–56, 58–59, 332–38), "are inconsistent

because she admitted to engaging in activities that show she is not as limited as alleged," R. 25

(citing R. 332–33, 652, 752, 737, 1040–41). *See* Pl.'s Br. 24–26. ALJ Munday found that Amy

had "admitted to handling personal care tasks independently, shopping in stores, caring for her

daughter, preparing simple meals, visiting her grandchildren, handling her own finances, and

doing some cleaning." R. 25; *see* R. 332–33, 652. Amy argues that her ability to "sporadically"

7

perform these basic activities is not inconsistent with her alleged inability to sustain full-time

work. Pl.'s Br. 25 (citing *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017)).

  *1. Medical Opinions*

  Medical opinions are "statement[s] from a medical source about what [the claimant] can

still do despite" her impairments and whether she has "impairment-related limitations or

restrictions" in meeting specific functional demands of work. 20 C.F.R. §§ 404.1513(a)(2),

416.913(a)(2). They can play a critical role in a proper RFC analysis. *See, e.g.*, *Oakes v.

Kijakazi*, 70 F.4th 207, 212–15 (4th Cir. 2023).

  The regulations instruct that ALJs "will consider" a source's medical opinions "using"

certain persuasiveness factors[5] and "will articulate" in their decisions "how persuasive [they]

find" those opinions to be. 20 C.F.R. §§ 404.1520c(a)–(b), 416.920c(a)–(b). "Of these factors,

supportability and consistency are the most important" in determining how persuasive medical

opinions are.[6] *Oakes*, 70 F.4th at 212; *see* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Thus,

ALJs "will explain how [they] considered the supportability and consistency factors" for each

source's medical opinions in articulating how persuasive they found those opinions to be.[7] 20

---

[5] Specifically, "an ALJ must consider the following factors: (1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like a physician's familiarity with the evidentiary record or their understanding of the SSA's policies and evidentiary requirements." *Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(1)–(5)).

[6] "Supportability is the degree to which a provider supports their opinion with relevant, objective medical evidence and explanation." *Oakes*, 70 F.4th at 212. "The more relevant the objective medical evidence and supporting explanation" the source provides, "the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "[C]onsistency is the degree to which a provider's opinion is consistent with the evidence [from] other medical and non-medical sources in the record." *Oakes*, 70 F.4th at 212. "The more consistent" the source's medical opinions are with other relevant evidence, "the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). "Supportability and consistency are distinct legal concepts under this regulation." *Daryl R. v. O'Malley*, No. 5:23cv59, 2024 WL 3649033, at *4 n.4 (W.D. Va. Aug. 5, 2024) (citing *Oakes*, 70 F.4th at 212; 20 C.F.R. §§ 404.1520c(b)(2)–(c)(2), 416.920c(b)(2)–(c)(2)). The ALJ "must adequately explain how she considered *both* factors in her persuasiveness determination." *Id.* (emphasis added).

[7] ALJs "may, but are not required to, explain how [they] considered" other factors, *id.*, such as the length,

C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Like the ultimate determination that a claimant has

or lacks residual functional capacity, [courts] review the subsidiary determination that a medical

opinion has or lacks supportability and consistency for substantial evidence." *Drumgold v.*

*Comm'r of Soc. Sec.*, 144 F.4th 596, 606 (4th Cir. 2025). This is not a high standard to satisfy.

*See Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "But when the ALJ's decision suggests that

[s]he selectively examined the record and ignored countervailing evidence, *Lewis*, 858 F.3d at

869, or that [s]he mischaracterized the facts to buttress [her] conclusions, *Arakas*, 983 F.3d at

102, that decision is not supported by substantial evidence." *Stephen R. v. O'Malley*, No. 21-

2292, 2024 WL 3508155, at *5 (4th Cir. July 23, 2024).

    2.   *Symptoms*

    "Symptoms mean [the claimant's] own statements describing [her] physical or mental

impairment." 20 C.F.R. §§ 404.1502(i), 416.902(n). Like medical opinions, symptoms can play a

critical role in a proper RFC assessment. *Mascio*, 780 F.3d at 636–37. The regulations set out a

two-step framework for ALJs to evaluate symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§

404.1529, 416.929. "First, the ALJ looks for objective medical evidence showing a condition that

could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the

claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting

effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *id.*,

to work on a regular and continuing basis, *Mascio*, 780 F.3d at 639. The claimant's "symptoms . .

. *will be determined* to diminish" her ability to work on such basis "to the extent that [the] alleged

---

nature, and extent of the source's treatment relationship with the claimant. 20 C.F.R. §§ 404.1520c(b)(2),
416.920c(b)(2). These particular factors inform the ALJ's persuasiveness determination insofar as they
"may help demonstrate" the "source has a longitudinal understanding" or greater "level of knowledge"
about the claimant's impairments and limitations. *See id.* §§ 404.1520c(c)(3)(i)–(iv), 416.920c(c)(3)(i)–
(iv).

functional limitations and restrictions" resulting from those symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence" in the record. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (emphasis added).

"The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. In doing so, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that she is disabled by pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at \*6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at \*2, \*4–5). *See* SSR 16-3p, 2017 WL 5180304, at \*10–11. Her articulated reasons for rejecting a claimant's complaints of disabling symptoms need only be legally adequate and logically supported by an accurate characterization of the evidence she relied upon in concluding that the claimant's complaints were not credible. *See Brown*, 873 F.3d at 269 ("[T]he ALJ must build an accurate and logical bridge from the evidence to his conclusion that the claimant's testimony was not credible." (cleaned up)).

B.    *Summary of Relevant Evidence*

1.    *Medical Records*

Dr. Brickhill-Atkinson was one of Amy's treating physicians at UVA's Crossroads Family Medicine ("Crossroads"). *See* R. 33 (citing R. 1072–75). As of July 2023, she had seen Amy "every 2 months" for the past ten months. R. 1072; *see* R. 861–72 (Nov. 2022); R. 834–37 (Jan. 2023); R. 905–07 (Mar. 2023); R. 986 (June 2023). Dr. Brickhill-Atkinson was part of a team of physicians and nurse practitioners at Crossroads who managed Amy's "extensive" psychotropic medications, R. 867 (Nov. 2022), and provided mental-health counseling since at

10

least August 2020. *See generally* R. 403–04, 407, 489–92, 498–501, 616–17 (office notes dated May–December 2020); R. 597–28, 609–10, 670–73, 676–80, 729, 734–37, 739–42, 744–48, 751–53, 756–69 (office notes dated January–December 2022); R. 652–53, 889–91 (office notes dated March–May 2022). As of June 2021, these providers had tried (and failed) to control Amy's persistent worrying, panic attacks, self-isolation, and irritability with increasingly stronger combinations of Abilify, Atarax, Buspar, Doxepin, Effexor, Klonopin, Remeron, Seroquel, and/or Trazadone. *See, e.g.*, R. 404–05, 489–90, 492, 499, 571, 598, 610–11, 616–17, 736, 740, 742, 744–45, 747, 752–53, 757–59. Amy's symptoms made it "very difficult" to "extremely difficult" for her to "take care of things at home[] or get along with people." R. 404, 490, 592, 758; *see also* R. 598, 610, 616, 745, 757.

In the spring of 2021, Amy developed delusional parasitosis, which caused her to believe that she could see and feel "worms" and "bugs" crawling on, under, or out of her skin. R. 744–75; *see* R. 672–73, 675, 687–88, 730, 732–35, 740–42, 835–37, 889–90, 907, 985. Numerous providers at UVA's family medicine, psychiatry, dermatology, and ophthalmology clinics told Amy that they did not see parasites anywhere on her body. R. 672, 675, 687–88, 731, 734, 740, 745. Amy insisted that the perceived parasites were real, and she frequently lashed out at providers whom she believed were refusing to treat her "skin condition," R. 687. *See, e.g.*, R. 672–73, 675–78, 687–88, 727, 732–34, 889–91.

Office notes from Crossroads and other UVA clinics dated July 2021 through May 2022 show Amy often was "anxious," R. 688, 733; "irritable," R. 688, 726; "agitated," R. 687, 889–90; "verbally hostile," R. 726–27; "yelling" and "very argumentative," R. 672; "extremely distressed," R. 687; or "very upset," R. 676, 734, during encounters with healthcare providers. *See also* R. 689, 734, 744, 746–48, 752 (providers' notes that Amy made suicidal statements in

the setting of active delusional parasitosis). "She state[d] she has bugs crawling under her skin that have faces and hooks. . . . [T]he worms have spread to involve her eye." R. 687 (Sept. 2021). She insisted that this "problem is related to her retinal detachment, and to her salivary gland surgery, and that 'they found something that they are not telling [her] about.'" R. 890 (May 2022). She repeatedly shaved her head and eyebrows because she believed they were infested with parasites. R. 733, 744, 752. At one point, Amy went to Crossroads "with her hair cut off in a bag" demanding "that 'someone has to figure out what is in [her] skin.'" R. 889 (May 2022). The physician who saw Amy that day commented that he had "known [her] a long time through the practice here but [he] was unable to get her to connect with any sense of trust—she quickly left, angry." R. 891. In March 2022, Amy spoke with a "frustrated tone" and "increased output." R. 823. Psychiatrist Christopher Rowley, M.D., described this as her "baseline" presentation. *Id.*; *see, e.g.*, R. 726 (Aug. 2021); R. 684 (Sept. 2021).

Amy saw Dr. Brickhill-Atkinson for the first time on November 2, 2022. *See* R. 861–72. She reported that her panic disorder was "long standing but really symptomatic now." R. 865. Amy had stopped taking all of her psychotropic medications "a couple months" earlier. R. 866. "She stopped the Effexor because she felt it was making her panic attacks worse and wasn't helping her low mood. She stopped the Abilify because she thought she didn't need it for the delusional parasitosis anymore, though she had been tolerating it well. . . . She stopped the trazodone for unclear reasons." *Id.* On this visit, Amy's "main concerns [were] feeling down, low energy, poor sleep . . . [and] ongoing panic attacks." *Id.* She fidgeted and shook her legs throughout the exam. R. 867. Her speech was "fast" and "pressured," and her affect was "neutral and flat." *Id.* Dr. Brickhill-Atkinson gave a mixed assessment of Amy's insight and judgment. On one hand, she exercised good insight and judgment because she acknowledged that she

needed "medication management of her mental health" and she came to this clinic appointment. *See id.* On the other, she did "not recognize [her] delusional parasitosis diagnosis," and she "suddenly stopp[ed] all psych mends." *Id.* Dr. Brickhill-Atkinson noted Amy's "delusional parasitosis [was] not as much at the forefront [on] this visit," but it was "unclear if she [was] masking these symptoms right now." *Id.* They had a "long conversation" about Amy "seeing psychiatry again to help with . . . medication management given extensive prior failed regimens." *Id.*. Dr. Brickhill-Atkinson also noted that Amy's "anxiety with strangers ha[d] been a barrier to seeking therapy before, but she would be comfortable seeing someone connected to [the Family Medicine] department." R. 867. She restarted Amy on Abilify and trazadone and referred her to UVA's Family Stress Clinic. *Id.*

Amy saw Dr. Brickhill-Atkinson again on January 12, 2023. *See* R. 834–37. Amy "sa[id] she pulls worms out of her skin." R. 835. She showed Dr. Brickhill-Atkinson "a Ziploc bag of tissues with various materials (mucous, make up mixed with cotton from cotton swabs, lint) as proof of the worms." *Id.* Dr. Brickhill-Atkinson opined that Amy's delusional parasitosis was "still active" and not responding to 15mg Abilify. R. 837. Amy was "tearful for most of [this] interview," but her speech was "less pressured" compared to her last visit. R. 837. Dr. Brickhill-Atkinson increased Amy's "trazadone for mood symptoms" and gave her mindfulness resources "to help with the anxiety that paralyzes her at home." *Id.* Amy was supposed to see Dr. Brickhill-Atkinson again on February 15, but she cancelled that appointment. *See* R. 920.

On February 20, 2023, Amy reestablished care with UVA Psychiatry. *See* R. 928, 979. Dr. Gabriel Rivera-Delgado, M.D., stopped Abilify and Effexor and started Amy on Haldol 0.5mg twice daily as needed for "psychosis & delusions." R. 979. On March 3, Amy showed Dr. Brickhill-Atkinson "2 more Ziploc bags . . . as evidence of the insects" she perceived. R. 907.

13

The bags were "full of dried mucus, hair, and lint." R. 905. Dr. Brickhill-Atkinson "acknowledged that this was distressing" for Amy and "strongly encouraged" her to start Haldol because it "would improve her distress" and "active delusions." *Id.* Amy exhibited dysthymic affect and congruent mood on this day's exam. *Id.* Her speech was less pressured "compared to prior" exams. *Id.* On April 24, Dr. Rivera-Delgado increased Amy's dose of Haldol to 1mg twice daily for mood, anxiety, and psychosis. R. 980. In June, he doubled the dose to 2mg twice daily for mood, anxiety, psychosis, and delusional parasitosis. R. 985 (June 23, 2023). Amy also saw Dr. Brickhill-Atkinson in June for "skin integrity" and pain in both hands. R. 986. Those office notes do not contain any relevant exam findings.

Dr. Brickhill-Atkinson provided the medical opinion at issue here in July 2023. *See* R. 1072–75. She had seen Amy "every 2 months" for the past ten months at this point. R. 1072. Dr. Brickhill-Atkinson did "not believe [Amy] can function well enough for a full time job." R. 1075. As most relevant here, she opined that Amy's psychiatric disorders "preclude[]" her from doing any of the following activities "for 15% or more of an 8-hour day": working at a consistent pace without taking unreasonable breaks; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior; and responding appropriately to changes in the work setting. R. 1073–74. Additionally, Amy's psychological symptoms would cause her to be: "off task" for "more than 30%" of a forty-hour workweek; totally absent from work "5 days or more" per month; unable to complete a full eight-hour workday "5 days or more" per month; and "less than 50%" efficient than an average worker. R. 1074. Dr. Brickhill-Atkinson based her medical opinions on Amy's "history and medical file, exams, progress and office notes, and psychological evaluations and reports," R. 33 (citing R. 1075). *E.g.*, R. 861–72

14

(Nov. 2022); R. 834–37 (Jan. 2023); R. 905–07 (Mar. 2023). Dr. Brickhill-Atkinson further

explained that Amy's "severe anxiety and delusional parasitosis cause her to perceive distressing

stimuli such as insect infestation that others do not perceive." R. 1074. "She is in constant

distress due to perceiving her body is infested with insects despite medication prescribed by a

psychiatrist." R. 1075. At the time, Amy was taking 100mg trazadone and 2mg Haldol twice

daily for mood, anxiety, psychosis, and delusional parasitosis. *See* R. 982, 1072.

Amy was supposed to follow up with Dr. Brickhill-Atkinson at Crossroads on August 21,

2023. *See* R. 995. They "converted [this visit] to telemedicine" after Amy "had trouble coming in

today due to anxiety." *Id.* Amy told Dr. Brickhill-Atkinson that this was "happening more

frequently." *Id.* Her "heart starts racing," she "gets shaky," and she "feels like she will die if she

leaves the house. She feels it's related to the way she looks." *Id.* This happens "any time she is

leaving the house – even going to the grocery store. Then [she] feels trapped." *Id.* Amy "tries to

take baby steps like walk[ing] to the porch" and "tries to talk herself through it. Some days, that

works. Sometimes she can work through it if she goes outside with her cat." *Id.* "Haldol doesn't

make her feel better or worse," *id.*, but she "reports less tearfulness since starting" 2mg twice

daily, R. 996. Amy appeared "anxious[,] but linear [and] goal directed" on exam. R. 996. Dr.

Brickhill-Atkinson continued 2mg Haldol and added propranolol for "agoraphobia [and] panic

attacks." *Id.*

In September, Amy established care with a therapist at the women's shelter. *See* R. 1009.

Amy's "headspace was not good," and she was "struggling with a lot of anxiety to even get out

the door" for her weekly appointment. *See id.* On October 26, 2023, a police officer took Amy to

the UVA emergency department ("ED") to be evaluated for suicidal ideation because "she stated

that she had nothing to live for and . . . she wanted to crash her car." R. 1000. On October 27, the

ED's "red team" obtained a temporary custody order ("TDO") to admit her to UVA's inpatient

psychiatric unit. R. 1006; *see* R. 1004–05. Amy was "labile and irritable on [initial] assessment."

R. 1018; *see also* R. 1002, 1003, 1004, 1013, 1020, 1023. Her thoughts "revolve[d] around

having social anxiety and wanting to go home." R. 1023; *see* R. 1006, 1013, 1018–20. She did

not think Haldol "ha[d] ever worked" for anxiety and depression. R. 1023. The admitting

psychiatrist discontinued Haldol and prescribed 20mg Prozac for anxiety, depression, and

adjustment disorder with mixed disorder of emotion and conduct. *See* R. 1024, 1028. He also

ordered 5mg Haldol and 2mg Ativan as needed "for agitation that is non-redirectable and poses

[an] imminent risk of harm to self or others." R. 1022.

Amy was involuntarily hospitalized under the TDO from October 27 through October 30,

2023. R. 1005–46. She repeatedly refused to leave her room because she was so afraid of people.

*See* R. 1010, 1013, 1017, 1029, 1036. She often was "tearful," "anxious," and/or "irritable" when

interacting with providers. R. 1013, 1014, 1023, 1033. If a nurse was present, Amy "appear[ed]

to become more distressed and perseverate[d] on the potential 'bad things that are happening

while she is in here.'" R. 1017; *see also* R. 1028, 1033. On October 29, Amy "was irritable and

yelling" at nurses because she wanted to leave. R. 1033. A nurse gave her 5mg Haldol, "which

was effective for agitation." *Id.* Later that day, Amy "became angry and threatened to act out

because she was told that she was not discharging home." R. 1029. A nurse gave her 2mg Ativan

"for her hostility with good results." *Id.*; *see* R. 1036–37. The next day, Amy was released to

outpatient care. R. 1040. Initially, Amy reported "improved mood" on 20mg Prozac. R. 1028.

Upon discharge, however, she reported that her "current dose of Prozac is too low and that her

anxiety comes back later in the day." R. 1045; *see* R. 1069. The psychiatrist explained that this

"dose can continue to be increased outpatient." R. 1045.

16

Amy followed up with UVA Psychiatry on November 8, 2023. *See* R. 1066–69. She told Laima Lengel, M.D., that she "feel[s] down all the time" and cries "daily." R. 1066. She "feels anxious and sad every day. She is afraid to leave the house." *Id.* The Prozac took her "from feeling okay to angry in a minute." *Id.* Dr. Lengel also noted Amy "remains convinced there's a 'spider web and hairs' growing all over her face and body. Therefore, she shaved her head and eyebrows" again. *Id.*; *see* R. 1068. On exam, Amy "adamantly endorse[d] delusional parasitosis." R. 1068. She exhibited "rapid," "anxious" speech and irritable, labile affect. *Id.* Her insight was "very poor." *Id.* Dr. Lengel discontinued Prozac and started Gabapentin 300mg for "high levels of daily anxiety and mood liability." *See* R. 1069. Amy also agreed to go back on "Abilify 2mg daily for delusional thinking." *Id.*

　　　2.　　*Amy's Statements*

In September 2020, Amy completed an Adult Function Report as part of her disability claims. R. 331–38. On a typical day, she would "take all meds, cry, go back to sleep after trying to take care of [her] daughter" and then "stay in [her] room." R. 333. Amy takes care of her daughter by "try[ing] to feed her and show her love." R. 332. Her mother also helps "when she can." *Id.* Amy has "no problems" with personal care, but she "sometimes skip[s] things" from lack of motivation. R. 332. She needs help "making sure [she's] clean and healthy." R. 333. She also needs reminders taking medication, going to doctors' appointments, and "taking care of [her] daughter's appointments." *Id.* Amy makes "simple" and "easy" meals, usually "anything microwavable." *Id.* Sometimes she just eats chips. *Id.* She cleans "what has to be" cleaned around her family's house, but it takes a "long time" because she needs to rest. *Id*. Her daughter helps clean, too. R. 333. Amy leaves home as little as possible. *See* R. 331, 334. She cannot go out alone because, "my heart races, I panic and start to freak out." R. 331, 334; *see also* R. 335,

338. Panic attacks "feel like the walls close in" and make her "think [she's] having a heart

attack." R. 338. Amy goes shopping at Wal-Mart "once a week [for] 2 hours." *See* R. 334–35.

She does "not like [having] people close to" her, R. 338, and does not "want any strangers

around," R. 336. She is "angry and upset all the time." *Id.* She does not handle stress or changes

in her routine well "at all." R. 337. She can handle a savings account, use a checkbook, pay bills,

and count change. R. 334.

In March 2022, Amy told her physician at Crossroads that she "really enjoyed" seeing

her grandkids the previous week. R. 652. "[T]his greatly reduced her anxiety." *Id.* Amy said she

planned "to see psych later this month in an effort to prove competence to regain custody of her

grandkids." *Id.* The physician encouraged her "to see them as much as she is able[,] as this does

appear to be very helpful with her anxiety." R. 653. Amy's grandchildren had been in foster care

since at least August 2021. *See* R. 672, 722, 821.

Amy testified at the ALJ hearing in December 2023. She explained that she could not

work because,

> I have a social disorder with people that I get nervous if I go outside my house
> sometimes when I step outside that door, I feel like I'm going to have a heart attack.
> And when I get around people and they stare, I just get nervous, I panic, and cry[]
> and I just can't get out of the door and I just shut down.

R. 53. She "hardly" leaves home. R. 54. She takes anti-anxiety medication 30 minutes before she

goes anywhere, including to doctors' appointments and the grocery store. R. 53, 59. She cries

before she gets back home. R. 59. She has panic attacks "at least twice a day" for "10 to 15

minutes" at a time. R. 53. They hit without warning. *Id.* She isolates in her bedroom "all day

long" seven days a week. R. 59. She cries "all day long on and off." R. 54–55. Medication does

not help. R. 55. She can manage her personal needs, but "sometimes three or four days go by"

before she remembers to shower. R. 59. Amy also explained that she "constantly" sees and feels

multiple bugs "crawling on [her] all day." R. 55–56. People "say they're not there, but they are

there." R. 55; *see* R. 56 ("I can feel them and see them, and I know I can."). She "know[s] if

[she] can see them, people can see them too." *Id.* She still shaves her hair and eyebrows "because

the bugs are in it." R. 56. She can see and feel the hairs "moving all . . . around in circles and

stuff." R. 56. These symptoms started in March 2021. *Id.*

C.      *The ALJ's Decision*

        ALJ Munday accurately summarized most of the above medical-source evidence when

assessing Amy's mental RFC. *See generally* R. 27–30 (citing R. 403–06, 489–92, 498–501, 591–

600, 609–13, 616–17, 652–53, 655, 663–64, 677–80, 684, 686–88, 722–38, 732–35, 738, 740–

42, 744–46, 752–53, 821–25, 835–37, 865–68, 889–91, 903–33, 995–97, 979–80, 981–85, 1000,

1020–25, 1028, 1033, 1045–46, 1048, 1051–61, 1066–68, 1072–75). Her narrative discussion

cites to specific parts of the medical record that she believed established Amy's "persistent

complaints of self-isolation," panic attacks, paranoia, and "delusions of bugs under her skin," R.

30, and mental-health treatment that "was just limited to different combinations of psychotropic

medications . . . with just one brief psychiatric hospitalization in October 2023," *id.* (citations

omitted). She also cited exam notes showing Amy had "mixed mental signs on exams," R. 33.

*See* R. 30 (summarizing the same, with citations to specific medical records). "These factors all

support limiting [Amy] to simple, routine tasks with additional social limitations as assessed" in

the ALJ's RFC finding. R. 30; *see* R. 23.

        ALJ Munday then considered Dr. Brickhill-Atkinson's medical opinions using the

persuasiveness factors in 20 C.F.R. §§ 404.1520c, 416.920c. *See* R. 33–34 (citing R. 1073–75).

She found that Dr. Brickhill-Atkinson was Amy's "treating provider" in July 2023, but that she

had "admitted only treating [Amy] once every 2 months for the past ten months" before giving

her opinions. R. 33; *see* 20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3). She also found that Dr.

Brickhill-Atkinson is not "a mental health specialist and is only a family medicine provider." R.

33; *see* 20 C.F.R. §§ 404.1520c(c)(3)–(4), 416.920c(c)(3)–(4). Overall, ALJ Munday concluded

that Dr. Brickhill-Atkinson's medical opinions "are not persuasive because they are not

supported by Dr. Brickhill-Atkinson's own treatment records and are not consistent with the

overall objective medical evidence of record." R. 33–34 (spelling corrected).

On supportability, ALJ Munday explained that Dr. Brickhill-Atkinson's "significant

restrictions are not supported by her own exams of [Amy] in late 2022 and 2023, which do not

indicate any significant physical limitations; conservative treatment of psychotropic medications

adjustments; and only slight mental deficits of some tearfulness or dysthymic affect (Exs. 8F/5–

7, 35–38; 9F; 14F/10–12)."[8] R. 33 (citing R. 835–37, 865–68, 903–33, 995–97); *see* R. 837 (Jan.

2023); R. 867 (Nov. 2022); R. 907 (Mar. 2023); R. 996 (Aug. 2023). On consistency, she

explained that Dr. Brickhill-Atkinson's

> severe mental restrictions are not consistent with [Amy's] typically normal
> behavior, activity, eye contact, perceptions, intellect, memory, and impulse control
> at regular psychiatric check ups (Exs. 6F/79–85; 7F/10–14; 18F), as well as normal
> thoughts, perceptions, memory, and impulse control during her brief psychiatric
> hospitalization with positive response to medications during her stay (Ex. 16F).

*Id.* (citing R. 722–28, 821–25, 1000–60, 1066–71). ALJ Munday did not explain how Dr.

Brickhill-Atkinson's status as Amy's treating physician, the length of her treatment relationship,

the frequency of her examinations, and/or her specialty in family medicine as opposed to "mental

health" made Dr. Brickhill-Atkinson's medical opinions more or less persuasive. *Id.*; *see* 20

C.F.R. §§ 404.1520c(c)(3)–(4), 416.920c(c)(3)–(4).

---

[8] Dr. Brickhill-Atkinson also completed a physical RFC assessment on Amy's behalf. *See* R. 33 (citing R.
1076–79). That medical opinion is not at issue on appeal.

ALJ Munday also considered Amy's symptoms as part of her mental RFC assessment. *See* R. 24–25. Her description of "the alleged symptoms" contains a mostly accurate summary of Amy's statements to the agency and her own healthcare providers—including Amy's statements qualifying the extent to which she performed certain activities of daily living. *See* R. 24 (citing R. 53–56, 58–59, 332–38, 652). ALJ Munday concluded that Amy's mental impairments could "reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and functionally limiting effects of these symptoms are not entirely consistent with the medical and other evidence in the record for the reasons explained in this [ALJ's] decision." R. 24–25. Her actual analysis, R. 25, contains only one reason why Amy's statements were "not entirely consistent" with other evidence in her record: "As for [Amy's] statements about the intensity, persistence, and limiting effects of [her] symptoms, *they are inconsistent because she admitted to engaging in activities* that show she is not as limited as alleged." R. 25 (emphasis added). ALJ Munday the listed the "admitted activities" that she found "inconsistent" with Amy's testimony "endors[ing] significant limitations" in mental functioning:

> [Amy] admitted in her function report that she had no problems with doing personal tasks like bathing and changing herself, aside from some decreased motivation; she cared for her daughter with help from her mother; she prepared simple meals daily; she did some cleaning with need for breaks; she shopped in stores weekly for 2 hours; and she could handle her own finances (Ex. 4E). . . . In March 2022, she reported really enjoying seeing her grandchildren recently, and she also noted plans to see psychiatry later that month to prove competence to regain custody of her grandchildren (Ex. 6F/9).

*Id.* (citing R. 332–38, 652).

"In sum," ALJ Munday found that Amy had "admitted to handling personal care tasks independently, shopping in stores, caring for her daughter, preparing simple meals, visiting her grandchildren, handling her own finances, and doing some cleaning." *Id.*; *see* R. 332–33, 652. ALJ Munday stated that she "considered these activities" in determining Amy's RFC, R. 25, and

later concluded that her RFC finding "is supported by [Amy's] admitted daily activities," among other factors, R. 34. She did not explain how these activities showed Amy could persist through an eight-hour workday.

D.    *Analysis*

1.    *Dr. Brickhill-Atkinson's Medical Opinion*

Amy challenges the ALJ's analysis of Dr. Brickhill-Atkinson's medical opinions on two grounds. First, she argues that 20 C.F.R. § 404.1520c "requires a two-step analysis of [medical] opinions where, at the first step, the ALJ considers *only* . . . the 'most important' factors of consistency and supportability to determine if the opinion in question meets the threshold requirement of being 'persuasive.'" Pl.'s Br. 14 (quoting 20 C.F.R. § 404.1520c(b)(2)); *accord id.* at 22 ("First, it is well-established . . . that the *only* factors an[] ALJ may consider at the first step of the § 404.1520c analysis is whether the opinion is consistent with supported by [sic] the record." (citing 20 C.F.R. § 404.1520c(a)–(b)). Her counseled brief suggests that Dr. Brickhill-Atkinson's medical specialty (or lack thereof) was a "wholly inapt" reason to reject her medical opinions because ALJ Munday already found those opinions "unpersuasive" at step one. *Id.* It does not explain what, if anything, an ALJ is supposed to do at step two. *See id.* at 22–24.

Amy misreads the regulation. *See* Def.'s Br. 13, ECF No. 18. Section 404.1520c states that ALJs "will consider" a source's medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate," to "evaluate the persuasiveness" of those opinions. 20 C.F.R. § 404.1520c(a), (b); *accord Oakes*, 70 F.4th at 212 ("[W]hen determining the persuasiveness of medical opinions, an ALJ *must consider* the following factors" listed in § 404.1520c(c)(1)–(5) (emphasis added)). The ALJ's decision "will *explain how* [it] considered the supportability and consistency factors" because those are "the most important factors [that ALJs]

22

consider when [they] determine how persuasive [they] find a medical source's medical opinions .

. . to be." 20 C.F.R. § 404.1520c(b)(2) (emphasis added). ALJs "may, but are not required to,

explain how [they] considered the [other] factors" listed in paragraphs (c)(3) through (c)(5). *Id.*

Accordingly, ALJ Munday did not err by "considering" Dr. Brickhill-Atkinson's medical

specialty and the extent of her treating/examining relationship with Amy when evaluating the

persuasiveness of her medical opinions.[9] *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

     Next, Amy agues that ALJ Munday's analysis of the supportability and consistency

factors is flawed because it ignores that Amy's anxiety and delusions "waxed and waned." *See*

Pl.'s Br. 23–24 (citing *Testamark v. Berryhill*, 736 F. App'x 395 (4th Cir. 2018)); Pl.'s Reply 5–

6. The Commissioner asks the Court to affirm the ALJ's conclusion that Dr. Brickhill-Atkinson's

significant off-task and attendance limitations were unpersuasive, R. 33–34, "[b]ecause the ALJ

discussed the required factors of supportability and consistency," Def.'s Br. 13. Amy has the

better position. *Cf. Stephen R.*, 2024 WL 3508155, at *5 (vacating and remanding in part

because, while "the ALJ invoked these factors," he "provided invalid reasons for discounting"

medical opinions imposing greater limitations than the RFC finding). As explained below, ALJ

Munday's analysis "suggests that [s]he selectively examined the record" and "mischaracterized

---

[9] That said, ALJ Munday's failure to explain *how* she considered these factors in concluding that Dr. Brickhill-Atkinson's medical opinions were "unpersuasive," R. 33–34, does make it difficult to say that substantial evidence supports this conclusion. *See* Pl.'s Br. 22; *cf. Arakas*, 983 F.3d at 95 ("Yet even under this deferential standard, we do not reflexively rubber-stamp an ALJ's findings. To past muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." (cleaned up)); *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 663 (4th Cir. 2017) ("Show your work. The ALJ did not do so here, and this error rendered his decision unreviewable."). Dr. Brickhill-Atkinson's progress notes indicate that she was familiar with Amy's complex psychiatric history and also "provided brief psychotherapeutic intervention," R. 866, 906, during some family-medicine visits. *See* R. 837–38, 867–68, 905–07. Evidence showing Dr. Brickhill-Atkinson had "a longitudinal understanding" and meaningful "level of knowledge" about Amy's anxiety and delusional parasitosis "may" make her medical opinions on those issues more persuasive, *see* 20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3), even though she is "only a family medicine provider," R. 33.

the facts to buttress [her] conclusions" that Dr. Brickhill-Atkinson's proposed limitations lacked

supportability and consistency. *Id.* at *4. She also failed to explain how she considered the *actual*

"objective medical evidence and supporting explanations presented by" Dr. Brickhill-Atkinson

to support her medical opinions, as the regulations explicitly require the ALJ to do, 20 C.F.R. §§

404.1520c(c)(1), 416.920c(c)(1). *Cf. Stephen R.*, 2024 WL 3508155, at *4 (concluding that "the

ALJ did not correctly apply 20 C.F.R. § 404.1520c" where his decision "invoked" the

supportability and consistency factors, but "his analysis was threadbare and lacked citations");

*Patterson*, 846 F.3d at 663 ("Administrative determinations are required to be made in

accordance with certain procedures which facilitate judicial review. We cannot fill in the blanks

for the ALJ in the first instance." (cleaned up)). Accordingly, ALJ Munday's decision "is not

supported by substantial evidence." *Stephen R.*, 2024 WL 3508155, at *4 (citing *Arakas*, 983

F.3d at 102).

On supportability, ALJ Munday explained that Dr. Brickhill-Atkinsons's "severe" off-

task and attendance limitations were "not supported by" the physician's own exam notes from

November 2022 to March 2023 because those notes purportedly "indicate . . . conservative

treatment of psychotropic medications adjustments[] and only slight mental deficits of some

tearfulness and dysthymic mood." R. 33 (citing R. 835–37, 865–68, 903–33, 995–97).

Substantial evidence does not support the ALJ's characterization of Dr. Brickhill-Atkinson's

office records. *Cf. Drumgold*, 144 F.4th at 607 (reviewing the ALJ's characterization of

claimant's medical records for substantial evidence). First, in November 2022, Dr. Brickhill-

Atkinson opined that Amy should "see[] psychiatry again to help with . . . medication

management given extensive prior failed regimens." R. 867 (citing R. 865–66). Those failed

courses included at least a dozen different sedatives (e.g., Klonopin, Trazadone), anti-depressants

24

(e.g., Buspar, Effexor, Remeron), and antipsychotics (e.g., Abilify, Haldol). *See, e.g.*, R. 404–05, 489–90, 492, 499, 571, 598, 610–11, 616–17, 736, 740, 742, 744–45, 747, 752–53, 757–59, 905–07, 980, 985. Dr. Brickhill-Atkinson and her colleagues repeatedly changed those medications and increased their dosages to address Amy's ongoing anxiety, panic, depressed mood, and active delusions. *See, e.g.*, R. 492, 499, 616, 735, 737–38, 742, 824, 837, 907, 979–80, 985. Dr. Brickhill-Atkinson also said "many times" that Amy needed additional counseling, but her anxiety and distrust were "barriers" to getting Amy "the level of support she needs." R. 907 (Mar. 2023); *accord* R. 867 (Nov. 2022). "A growing number of district courts have held that in cases where claimant's consume antidepressant, anticonvulsant, and/or antipsychotic drugs, consistently attend visits with mental health profession[al]s, and endure constant medication adjustment and management, their treatment is classified as anything but 'routine and conservative.'" *Shelley C.*, 61 F.4th at 363; *see, e.g.*, *Edwin M. v. Saul*, No. 4:19cv46, 2021 WL 1565415, at *9 (W.D. Va. Apr. 21, 2021) (collecting cases), *cited with approval in Shelley C.*, 61 F.4th at 363 n.11. Moreover, ALJ Munday did not explain why she characterized Amy's treatment as "conservative" even though Dr. Brickhill-Atkinson's "own treatment records," R. 33–34, expressly describe it as "extensive" and unsuccessful, R. 867. This raises concern that ALJ Munday was "improperly 'playing doctor'" in determining that Dr. Brickhill-Atkinson's medical opinions were not persuasive. *Cf. Lewis*, 858 F.3d at 869 ("In light of the extensive treatment Lewis received for her various conditions, the ALJ's designation of [the] course of treatment as 'conservative' amounts to improperly 'playing doctor' in contravention of the requirements of applicable regulations.").

Second, ALJ Munday found that Dr. Brickhill-Atkinson's "own exams" of Amy in late 2022 and 2023 "indicate . . . *only slight* mental deficits of some tearfulness and dysthymic

affect." R. 33 (emphasis added). "That is simply untrue," *Shelley C.*, 61 F.4th at 355. *See, e.g.*, R.

837, 867, 907. In November 2022, Amy exhibited "fast," "pressured" speech with "neutral and

flat affect." R. 867. She fidgeted throughout the exam. *Id.* Dr. Brickhill-Atkinson noted that her

"delusional parasitosis [was] not as much at the forefront [on] this visit," but it was "unclear if

she [was] masking these symptoms." *Id.* Amy did "not recognize [her] delusional parasitosis

diagnosis" as real. *Id.* ALJ Munday did not mention these abnormal findings. R. 33; *see* R. 28–

29 (citing R. 867). More importantly, in the same medical records containing the "slight mental

deficits" relied upon by ALJ Munday, Dr. Brickhill-Atkinson also noted that she observed Amy

exhibit the "anxiety and delusional parasitosis" behaviors, R. 1074, that she subsequently cited to

support her proposed limitations. R. 835–37, 867, 907, 1074–75; *see Lewis*, 858 F.3d at 869. In

early 2023 alone, Dr. Brickhill-Atkinson described two separate visits where Amy showed her

Ziploc bags full of mucous, lint, and cotton as "proof" or "evidence" of the worms and insects

that Amy believed infested her body. R. 835, 905–07. Dr. Brickhill-Atkinson "acknowledged

that this was distressing" for Amy and "strongly encouraged" her to start Haldol because it

"would improve her distress" and "active delusions." R. 907. That July, Dr. Brickhill-Atkinson

explained that she chose "severe" off-task and attendance limitations, R. 33, because, in her

professional judgment, her office notes and physical exams showed that Amy "is in constant

distress due to perceiving her body is infested with insects," R. 1075. ALJ Munday did not

mention Dr. Brickhill-Atkinson's observations in her decision. *See* R. 28–29, 33–34. Thus, she

appears to have cherrypicked two examples of "slight mental deficits" out of Dr. Brickhill-

Atkinson's treatment records while ignoring the very serious deficits that the physician herself

indicated supported her proposed limitations. R. 34.

       This was error. "An ALJ has an obligation to consider all relevant medical evidence and

cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869. Moreover, "supportability" requires ALJs to examine "the degree to which *a provider supports their opinion* with relevant, objective medical evidence and explanation." *Oakes*, 70 F.4th at 212 (emphasis added) (citing 20 C.F.R. § 404.1520c(c)(1)); *see Daryl R.*, 2024 WL 3649033, at *4 n.4 ("Supportability and consistency are distinct legal concepts under this regulation. . . . [The ALJ] must adequately explain how she considered both factors in her persuasiveness determination."). "The more relevant" the provider's cited evidence and explanation, "the more persuasive [her] medical opinion . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1); *accord Drumgold*, 144 F.4th at 606 ("This makes sense: In disability claims, as in life, opinions are more persuasive when evidence backs them up."). Here, ALJ Munday did not explain how she considered "the objective medical evidence and supporting explanations" Dr. Brickhill-Atkinson "presented" to support her medical opinions. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). She merely pointed to *other* isolated findings from Dr. Brickhill-Atkinson's exam notes that the ALJ believed, in her lay opinion, did "not support" the physician's proposed limitations. *See* R. 33; *cf. Daryl R.*, 2024 WL 3649033, at *4 n.4 (ALJ's analysis "misapplied the governing regulation" by conflating the supportability and consistency factors); *Howard v. Saul*, 408 F. Supp. 3d 721, 731(D.S.C. 2019) ("To isolate just one variable out of context and use it as a basis to discredit the conclusion of a medical professional is equivalent to the ALJ 'playing doctor.'" (quoting *Lewis*, 858 F.3d at 869)). The court "cannot fill in the blanks for the ALJ in the first instance" where she has not properly considered a mandatory factor. *See Patterson*, 846 F.3d at 662.

On consistency, ALJ Munday explained that Dr. Brickhill-Atkinson's "severe mental restrictions are not consistent with [Amy's] typically normal behavior, activity, eye contact,

perceptions, intellect, memory, and impulse control at regular psychiatric check ups" in August

2021, March 2022, and November 2023, "well as normal thoughts, perceptions, memory, and

impulse control during her brief psychiatric hospitalization [in October 2023] with positive

response to medications during her stay." R. 33 (citing R. 726, 823, 1000–50, 1068). "This

conclusion was not supported by substantial evidence because the record, when read as a whole,

reveals no inconsistency between" Dr. Brickhill-Atkinson's restrictions and the cited healthcare

encounters. *Hines*, 453 F.2d at 566. To start, Amy's behavior during many of those encounters

was not "normal" at all.[10] *See, e.g.*, R. 726–27, 2017, 1020, 1029, 1033, 1068–69; *cf. Shelley C.*,

144 F.4th at 354 (ALJ's characterization of medical treatment as "routine and conservative" was

"simply untrue."). In August 2021, Amy "became very irritable and even verbally hostile" when

Dr. Rowley mentioned illicit drug use. R. 727. In October 2023, doctors and nurses at UVA's

inpatient psychiatric unit consistently described Amy's behavior as "irritable," R. 1014, 1018,

1020; "very labile, tearful, crying, . . . angry and threaten[ing] to act out," R. 1029; "irritable and

yelling" at them, R. 1033; "anxious and tearful," R. 1013; and "distressed," R. 1017. That

November, Amy "adamantly endorse[d] delusional parasitosis" on exam. R. 1069. She "shaved

her head and eyebrows" because she "remains convinced there's a 'spider web and hairs'

growing all over her face and body." *Id.* She exhibited "rapid," "anxious" speech and irritable,

---

[10] The ALJ's use of the phrase "typically normal behavior," R. 33, likely refers only to the normal psychiatric signs listed next to "Behavior & Motor," *see, e.g.*, R. 726 ("No psychomotor behavior detected, no abnormal movements noted"); R. 1068 ("No abnormal involuntary or volitional movements"); R. 1033 ("[L]aying in bed on side"); R. 30 (citing exams showing "normal psychomotor behavior"). *See* 20 C.F.R. §§ 404.1502(g), 416.902(l) ("Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated."). The ALJ should have considered Amy's "behavior" in the broader context of how she presents or conducts herself. *See, e.g.*, 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.00(E)–(F), 12.03(A)(3), 12.06(A)(1)(d), 12.08(A)(9); *cf. Sharon H. v. Saul*, No. 3:18cv111, 2020 WL 6281610, at *5 (W.D. Va. Oct. 27, 2020 (Moon, J.) (noting that "abnormal [psychiatric] findings" include providers' observations that the claimant was outwardly "anxious," "defensive," "agitated," or "angry/hostile").

labile affect. R. 1068. None of these outward behaviors can fairly be characterized as "normal." *See, e.g.*, *Sharon H.*, 2020 WL 6281610, at *5. ALJ Munday's "failure to build an accurate and logical bridge from the evidence" to her contrary conclusion is reversible error. *Lewis*, 858 F.3d at 868.

Second, even if the court accepted ALJ Munday's characterization of the medical record, her consistency analysis is still legally flawed. *See, e.g.*, *Testamark*, 736 F. App'x at 399; *Howard*, 408 F. Supp. 3d at 731 (citing *Lewis*, 858 F.3d at 869). That is because, "[b]y relying on these limited [normal] observations to discredit" Dr. Brickhill-Atkinson's medical opinion, ALJ Munday's decision "seizes on insignificant inconsistencies in the treatment record while overlooking the record's broader import." *Testamark*, 736 F. App'x at 399. To start, Dr. Brickhill-Atkinson's off-task and attendance restrictions are based on Amy's "severe anxiety and delusional parasitosis [that] cause her to perceive distressing stimuli . . . that others do not perceive" and the "constant distress" that Amy feels because she "perceive[s] her body is infested with insects." R. 1074–75. They are not based on alleged deficits in Amy's eye contact, memory, intellect, or impulse control. R. 1074–75. ALJ Munday did not explain why normal findings in those mental spheres "bear[] any nexus," *Lewis*, 858 F.3d at 869, to determining how persuasive Dr. Brickhill-Atkinson's opinion about Amy's distress and delusions will be. *See Testamark*, 736 F. App'x at 398–99. Accordingly, her decision does not build an accurate and logical bridge from that evidence to her conclusion that Dr. Brickhill-Atkinson's medical opinion lacks consistency. *See id.*

Findings that Amy exhibited normal thoughts and perceptions at the cited encounters, *e.g.*, R. 726, 823, 1068, are relevant to the consistency question. As Amy points out, however, ALJ Munday's mental RFC evaluation itself "described a waxing and waning pattern of mental

impairments," Pl.'s Br. 24, "not least of which is [Amy's] pervasive belief . . . of bugs all over her skin," *id.* at 19 (citing R. 29–30, 34). *See also id.* at 23–24; Def.'s Br. 13 ("[T]he ALJ acknowledged that Plaintiff's symptoms waxed and waned"); Pl.'s Reply 4–5. Thus, the fact that Amy did not endorse delusions "on certain specific occasions is not inconsistent with the conclusion that she is unable to work." *Testamark*, 736 F. App'x at 398–99. ALJ Munday did not explain how she reached the contrary conclusion. *See Lewis*, 858 F.3d at 868.

The same logic applies to the ALJ's conclusion that Dr. Brickhill-Atkinson's proposed limitations were inconsistent with Amy's "positive response to medications during her stay" on UVA's psychiatric unit in October 2023, R. 33. That conclusion appears to rely on evidence that Amy "noted improved mood on Prozac, though she required Haldol once for agitation." R. 29 (citing R. 1028, 1033, 1048). Those events happened on October 28 and October 29. *See* R. 1028, 1033, 1048. Amy was released to outpatient care on October 30. R. 1040. At that point, she reported her "current dose of Prozac is too low and that her anxiety comes back later in the day." R. 1045. The psychiatrist explained that her "dose can continue to be increased outpatient." R. 1045. When Amy visited UVA psychiatry one week later, she told Dr. Lengel that Prozac took her "from feeling okay to angry in a minute." R. 1066. Amy "adamantly endorse[d] delusional parasitosis" on that day's exam. R. 1068. She exhibited "rapid," "anxious" speech and irritable, labile affect. *Id.* Her insight was "very poor." *Id.* Dr. Lengel stopped the Prozac and started Gabapentin 300mg for "high levels of daily anxiety and mood liability." *See* R. 1069. Amy also agreed to go back on "Abilify 2mg daily for delusional thinking." *Id.* Viewed in context, it appears that Amy's "positive response to medications" lasted at most a few days. *Cf. Shelley C.*, 61 F.4th at 348 ("Shelley C. usually spiraled into deepened periods of heightened anxiety and depression mere days after she vocalized her improvement."). This isolated, trivial

inconsistency does not make Dr. Brickhill-Atkinson's medical opinion that Amy cannot

"function well enough for a full time job" because she "is in constant distress due to perceiving

her body is infested with insects despite medication prescribed by a psychiatrist," R. 1075, any

less persuasive. *Cf. Shelley C.*, 61 F.4th at 357 (applying 20 C.F.R. § 404.1527(c)). Again, ALJ

Munday did not explain why she reached the contrary conclusion.

       2.     *Amy's Symptoms & Activities*

      Amy also objects to ALJ Munday's conclusion that her statements describing disabling

psychiatric symptoms and mental limitations, R. 24 (citing R. 53–56, 58–59, 332–38), "are

inconsistent because she admitted to engaging in activities that show she is not as limited as

alleged," R. 25 (citing R. 332–33, 652, 752, 737, 1040–41). *See* Pl.'s Br. 24–26. ALJ Munday

found that Amy "admitted to handling personal care tasks independently, shopping in stores,

caring for her daughter, preparing simple meals, visiting her grandchildren, handling her own

finances, and doing some cleaning." R. 25; *see* R. 332–33, 652. She also recognized that Amy

did not do all of these things daily or independently. *See* R. 25. Amy cared for her 16-year-old

"daughter with help [from] her mother." *Id*. (citing R. 332, 752). She took breaks when cleaning

and only went shopping once a week. R. 25. She "visit[ed] her grandchildren" once, in March

2022. *Id.* (citing R. 652). Amy argues that her "sporadic" ability to perform these activities is not

inconsistent with her alleged inability to sustain full-time work. Pl.'s Br. 25 (citing *Brown*, 873

F.3d at 263). The Commissioner responds that "these activities are not fairly characterized as

'sporadic,'" and, in any event, ALJ Munday did not equate them with full-time work. *See* Def.'s

Br. 18–19 (citing *Ladda v. Berryhill*, 749 F. App'x 166, 173 n.4 (4th Cir. 2018) ("[T]he ALJ

cited Ladda's daily activities for purposes of the [symptom] credibility determination and not as

examples of the functions Ladda could perform for an entire day.")). Amy has the better position.

ALJs should consider relevant information about a claimant's activities as one factor in determining the extent to which her testimony about the intensity, persistence, and functionally limiting effects of her symptoms can reasonably be accepted as consistent with other evidence in the record. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); *see* SSR 16-3p, 2017 WL 5180304, at *6–7. However, "[a]n ALJ may not consider the *type* of a claimant's activities without also considering the *extent* to which she can perform them." *Arakas*, 983 F.3d at 99 (quotation marks omitted). Further, an ALJ who concludes that the claimant's statements concerning the intensity, persistence, or limiting effects of her symptoms are "inconsistent" with statements concerning her daily activities must logically explain that conclusion. *See Hines*, 453 F.3d at 565–66.

ALJ Munday's decision does not meet this deferential standard of review. First, she omitted some of Amy's qualifying statements when describing the "activities" to which Amy purportedly admitted engaging in. *See Arakas*, 983 F.3d at 99. For example, Amy said that she "cared for her daughter" by "try[ing] to feed and show her love." R. 332. There is no evidence that she did anything else for her daughter. *Cf. Donald O. v. Bisignano*, No. 4:24cv15, 2025 WL 2181411, at *10 (W.D. Va. Aug. 1, 2025) (substantial evidence did not support ALJ's finding that "Donald's 'reported activities' included 'traveling with his son out of state'" because there "is no evidence in the record that Donald actually went on this [one] trip"). Similarly, the "simple meals" that Amy prepares are limited to "anything microwavable or easy." R. 333. But, sometimes she just eats chips. *Id.*

Second, ALJ Munday concluded that Amy's testimony describing frequent and severe panic attacks, delusions, social anxiety, and self-isolation, *see* R. 24, was "inconsistent because [Amy] admitted to engaging in [the] activities" listed above, R. 25. To the ALJ, those activities showed that Amy "is not as limited as alleged." *Id.* But she never explained *how* the activities

32

supported her conclusion. *See Hines*, 453 F.3d at 565–66. For example, Amy's testimony that "she saw and felt multiple bugs crawling [on her] all day, every day, since March 2021," R. 24, is consistent with Amy's ability to microwave a meal, do some cleaning, try to feed her daughter "with help" from her mother, and go shopping once a week, R. 25. *Cf. Donald O.*, 2025 WL 2181411, at *10 (concluding that, even if Donald did go on one trip, "ALJ Munday did not explain why Donald's testimony that back pain severely restricted his ability to stand was 'inconsistent' with traveling one time during the five-year relevant period." (citing *Hines*, 453 F.3d at 565)). The same is true for Amy's testimony that she had "panic attacks at least twice daily," cried "on and off all day," and "had difficulty going to stores and would cry when she returned," R. 25. Amy could experience these disabling symptoms and still do all the basic activities that ALJ Munday relied upon in her decision. *Cf. Arakas*, 983 F.3d at 101 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."). The critical flaw in the ALJ's conclusion is that it fails to recognize that Amy could do these things on whatever schedule and to whatever "standard of performance" her psychiatric symptoms allowed. *Cf. id.* (explaining the "critical differences between activities and activities in a full time-job"). Accordingly, ALJ Munday failed to build an accurate and logical bridge from the activities she cited to her conclusion that Amy's testimony was not credible. *See Brown*, 873 F.3d at 269.

## V. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: December 29, 2025

Joel C. Hoppe
United States Magistrate Judge